UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 10-51-DLB-JGW

RICHARD WESLEY                                                    PLAINTIFF

vs.                    <u>MEMORANDUM OPINION AND ORDER</u>

JOANNE RIGNEY                                                     DEFENDANT

\*\*\*  \*\*\*  \*\*\*  \*\*\*

## I.  INTRODUCTION

This § 1983 action is again before the Court on Defendant Joanne Rigney's Motion for Summary Judgment (Doc. # 79) on Plaintiff Richard Wesley's retaliatory arrest claim, which has been fully briefed (Docs. # 86, 88).  Rigney argues, *inter alia*, that she is entitled to qualified immunity pursuant to *Reichle v. Howards*, 132 S.Ct. 2008 (2012), because it was not clearly established at the time of Wesley's arrest that she could be liable for a retaliatory arrest that was otherwise supported by probable cause.  Wesley concedes that *Reichle* controls the Court's determination, and that Rigney is entitled to qualified immunity if she had probable cause to believe that he committed sexual abuse in the first degree. Because the Court finds that Rigney did have probable cause, the Court will **grant** her motion for summary judgment, finding that she is entitled to qualified immunity.

## II.  FACTUAL BACKGROUND

### A.     J.S. is called to Richard Wesley's office

On February 5, 2009, Plaintiff Richard Wesley was standing beside his office door at Sixth District Elementary School in Covington, Kentucky when he heard a commotion

in the hallway.  (Doc. # 82 at 119).  Wesley walked toward the noise and found J.S., a seven-year old student, crying and attempting to put cloth wristbands over his nose and mouth in an apparent attempt to commit suicide.  (*Id.* at 120).  Wesley, the school's counselor, stopped J.S.'s attempt and took the child back to his office.

What happened once Wesley and J.S. arrived at Wesley's office is disputed. According to Wesley, he said to J.S., "what's going on, talk to me . . ."  (*Id.* at 121).  J.S. initially responded that he did not wish to talk, but later said, "I want to hurt myself" and "I want to kill myself."  (*Id.*).  After these concerning comments, Wesley put J.S. in his office with three other children and called J.S.'s mother, M.D.  (*Id.*).  Wesley advised M.D. that J.S. had attempted to hurt himself and that the child needed to be seen at NorthKey, a mental health facility.  (*Id.* at 122).

M.D. and J.S.'s stepfather arrived at Sixth District Elementary School ("Sixth District") soon thereafter.  (*Id.* at 123-24).  Wesley again explained that J.S. needed to be immediately examined at NorthKey, but M.D. initially resisted.  (*Id.* at 124).  In an apparent attempt to convey the gravity of the situation, Wesley threatened to call Child Protective Services if M.D. continued to refuse.  M.D responded, "No, I don't want you calling them, I'll take him to NorthKey."  (*Id.*).  M.D. then called NorthKey and made arrangements to have J.S. examined immediately.

After the arrangements with NorthKey were made, Wesley walked J.S. back to his classroom to gather his belongings while M.D. and the stepfather remained in Wesley's office.  (*Id.* at 125).  On the way back to his office, Wesley told J.S., "whatever you do, make sure you tell them everything that is bothering you at the hospital, whether it's anything that's bothering you at school, whether anything is bothering you at home, make

sure you let them know." (*Id*).  A taxi arrived soon thereafter and transported J.S., M.D. and the stepfather to NorthKey.  (*Id.* at 126).  Wesley followed the taxi in his own vehicle. (*Id.*).

### B.   J.S. discloses that Richard Wesley had sexually abused him

During the ride to NorthKey, J.S. disclosed to his mother and stepfather that Wesley had sexually abused him.[1]  (*Id.* at 157; Doc. # 80-1 at 3).  The taxi arrived at NorthKey, and Wesley parked his vehicle nearby.  (Doc. # 82 at 132).  As J.S., M.D. and the stepfather neared the front door of the building, they were approached by Wesley.  M.D. looked at Wesley and screamed, "I know what you said to him.  I know what you told him . . . You're going  to lose your job." (*Id.*).  Wesley acted as if he did not know what she was talking about.  M.D. then said, "You're going to lose your job . . . I don't want you here, leave, you need to leave." (*Id.* at 133).  Wesley complied and returned to Sixth District.  (*Id.* at 134).

Apparently while at NorthKey, J.S. disclosed that "his school counselor, Rich Wesley [was] touching his private parts."  (Doc. # 80-1 at 1).  J.S. explained that he was initially afraid to tell his mother, but finally decided to tell his mother about the abuse.  (*Id.*).  Allison Campbell, an employee of the Commonwealth of Kentucky's Cabinet for Families and Children, was then contacted about J.S.'s disclosure.

Campbell arrived at NorthKey a short time later to interview J.S.  Campbell later recounted her conversation with J.S. as follows:

> [J.S.] informed me he attends 6th District and is in the 1st grade.  He also informed me he resides with his mom, sister and step-dad. [J.S.] reported he believed I was there due to his counselor, Mr. Wesley.  [J.S.] further reported

---

[1]  The parties have not directed the Court to any record evidence which provides details of J.S.'s initial disclosure.

that earlier that day he was in Mr. Wesley's office due to being in trouble at school. When [J.S.] first arrived there were two other children in the room but a little while later they all left and he was alone with Mr. Wesley. Mr. Wesley closed the door (he indicated it was not shut all the way but was open a small crack) and stood next to [J.S.] by the round table in his office. Mr. Wesley then touched [J.S.]'s "private part" with his left hand. [J.S.] reported the touch was on top of the clothes. He further reported that he and Mr. Wesley both had their clothes on. He denied Mr. Wesley said anything at that time but before [J.S.] left Mr. Wesley grabbed [J.S.] on the shoulder and told him not to tell anyone.

(*Id.* at 2).

In light of J.S.'s disclosure, Campbell contacted JoAnne Rigney, one of two detectives with the Covington Police Department who investigated child sexual abuse cases, to report potential criminal conduct. (Doc. # 80 at 98; Doc. # 79-3). The Covington Police Department did not have a written or established procedure for assigning sexual abuse cases between the two detectives. (Doc. # 79-3). Instead, Rigney and the other detective, Bryan Frodge, informally determined between themselves who would handle a particular case. (*Id.*). As part of this informal process, it was common for social workers to contact either Rigney or Frodge directly about a case. (*Id.*). Campbell complied with this informal, yet accepted, practice by contacting Rigney directly. (*Id.*).

During Campbell's phone call to Rigney, she explained only that J.S. had disclosed that he was sexually abused. (Doc. # 81 at 47). According to Rigney at her deposition, Campbell did not share specifics of the disclosure, however. (*Id.*). In fact, Rigney testified that she never heard the specifics of J.S.'s disclosure to Campbell until Campbell's report was read to her at her deposition. (*Id.*). Nonetheless, based on the general report of J.S.'s disclosure, Rigney scheduled a forensic interview of J.S. with the Children's Advocacy

Center ("CAC") on February 11, 2009.[2]

### C.    J.S. is interviewed at the Children's Advocacy Center

On February 11, 2009, J.S. and his mother reported to the CAC for J.S.'s forensic interview. Campbell and Rigney watched through a double-sided mirror as CAC employee Lydia Noll interviewed J.S. (Doc. # 80-1 at 2). When Noll asked J.S. why he thought he was being interviewed, J.S. responded, "because my counselor did something bad." (DVD of February 11, 2009 interview at CAC at 14:25). J.S. then clarified that he was talking about his "counselor at school," "Mr. Wesley." (*Id.* at 14:33; 14:38). J.S. explained that he was in Wesley's office at Sixth District Elementary because "[Wesley] told me to get in there." (*Id.* at 17:43). No one else was in the office. (*Id.* at 17:49). J.S. remembered that Wesley's office door was cracked open just a few inches.[3] (*Id.* at 17:19). J.S. recounted

_____

[2] Although neither party brings it to the Court's attention, it appears that Officer J. Hamblin responded to M.D.'s residence at 8:46 a.m. on February 6, 2009, after M.D. complained to police about Wesley's conduct. (Doc. # 91 at 4). Officer Hamblin only spoke to M.D. upon his arrival, who recounted J.S.'s initial disclosure to her in the taxi ride to NorthKey (*Id.*). J.S. told his mother that Wesley had been "touching his private parts" while in Wesley's office, and the abuse occurred over the course of approximately a year (*Id.*). More specifically, J.S. apparently explained to his mother that Wesley would remove his penis from his pants and touch it.

J.S.'s alleged disclosure to his mother that Wesley removed his penis from his pants when he fondled it is inconsistent with his other statements that Wesley fondled his penis on top of his clothes. This inconsistency is minimal when J.S.'s disclosures are considered in their totality. Important details remained the same during each disclosure, including: (1) Wesley fondled J.S.'s penis; (2) the abuse always occurred in Wesley's office; and (3) the abuse occurred over the course of a year. Thus, this minor inconsistency does not discredit J.S.'s overall disclosure.

Additionally, the Court need not consider Officer Hamblin's report at all because neither party has cited it in their briefing to the Court. Federal Rule of Civil Procedure 56(c)(1)(A) requires the parties to bring any fact to the Court's attention by citing to particular parts of materials in the record. "The Court has no duty when deciding a motion for summary judgment to scour the record for evidence that supports a plaintiff's claim." *Abdulsalaam v. Franklin County Bd of Com'rs*, 637 F. Supp. 2d 561, 576 (S.D. Ohio 2009) (citing *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379 (6th Cir. 2007)). For each of these reasons, Officer Hamblin's report does not affect the Court's ultimate conclusion that J.S.'s disclosures were credible and provided probable cause.

[3] J.S. did not explicitly state that the door was cracked open a few inches. Instead, when asked where the abuse occurred, J.S. asked Noll: "Do you want me to show you how the door been?" (*Id.* at 17:05). J.S. then stood, walked toward a door in the interview room and cracked it open a few inches.

that Wesley had "put his private part in my butt" as the two were standing next to a blue round table in Wesley's office. (*Id.* at 14:40; 16:54). He stated that Wesley's pants were off at the time, and that Wesley pulled down the back of his "soft pants" in order to sodomize him. (*Id.* at 16:21). J.S. also explained that Wesley "squeezed" his penis outside of his pants. (*Id.* at 21:07; 24:50). During this time, J.S. did not see Wesley's "private part," but remembered looking out the office window and seeing his mom, dad and sister. (*Id.* at 29:55). J.S. remembered feeling "sad" when this happened, and explained that "it don't feel good." (*Id.* at 15:55; 16:02).

J.S. also told Noll that the abuse was not limited to one occasion. J.S. explained that the abuse started a year earlier when he was in kindergarten. (*Id.* at 23:00). J.S. remembered that the abuse began when he and his family were living on Greenup Street, and continued while he lived at a local homeless shelter, and then as he lived at a third location. (*Id.* at 18:22).

Noll also asked J.S. if Wesley ever told him anything after the abuse. J.S. explained that Wesley threatened to kick him out of school if he ever told. (*Id.* at 22:58). As J.S. explained it, "[Wesley] was trying to scare me." *Id.* Later in the interview, J.S. said that he did not tell anyone about the abuse sooner because he was scared. J.S. reiterated that "[Wesley] said if you talk to somebody, I will . . . he gonna kick me out of that school." (*Id.* at 26:20). J.S. recalled that he first disclosed the abuse to his mother and stepfather as they were riding in the taxi to NorthKey on February 5, 2009.

J.S. also told Noll that Wesley was abusing at least two other boys in the third grade. (*Id.* at 21:52). J.S. did not remember the boys' names, and only remembered that they each told him they were treated similarly. J.S. confirmed, though, that he never saw any

other children being abused by Wesley.

### D. Campbell and Rigney's subsequent investigation

At the conclusion of J.S.'s forensic interview, Campbell and Rigney met with J.S.'s mother, M.D.[4]  M.D. reported that J.S. had recently been exposing his buttocks and penis to his siblings, and that he had begun wetting the bed, something he had not previously done.  (Doc. # 80-1 at 3).  M.D. also recalled the events that transpired on February 5, 2009.  (*Id.*).  She explained that Wesley continuously honked his car horn and waived as he followed them in their taxi to NorthKey.  (*Id.*).  When they arrived at NorthKey and M.D. told Wesley to stay away, Wesley continuously apologized and said that if he touched J.S.'s leg, it was not meant the way it might have appeared.  (*Id.*).  M.D. also reported that Wesley appeared at her apartment after she returned with J.S. from NorthKey, and again showed up at her apartment the night before J.S.'s interview at the CAC.

Later in the day on February 11, 2009, Campbell and Rigney went to Sixth District to speak with the principal, Dr. Anthony Ross.  (Doc. # 81 at 56-57; Doc. # 80-1 at 3).  Rigney questioned Dr. Ross on whether it was normal for school personnel to go to students' homes after hours.  (Doc. # 81 at 131-32).  Dr. Ross explained that this would be unusual, and that any visits were only done with his permission.  (*Id.*).  Additionally, Dr. Ross said that school personnel were not allowed to make a home visit without being accompanied by a colleague.  (*Id.*).

---

[4]  A dispute exists in the record as to whether both Campbell and Rigney met with M.D. at the conclusion of J.S.'s interview.  According to Campbell's notes, both she and Rigney met with M.D.  However, Rigney did not recall meeting with M.D., but instead remembered learning about M.D.'s conversation with Campbell at the CAC later in time.  This dispute is immaterial, in any event, because Rigney recalls learning this information at some point in time prior to filing her affidavit in support of an arrest warrant.  (Doc. # 81 at 156).

Dr. Ross also provided Campbell and Rigney with access to Wesley's office, as well as a list of all students that had been seen by Wesley. (*Id.*). Campbell and Rigney took pictures of Wesley's office at some point thereafter. (Doc. # 81 at 59). Rigney observed the layout of Wesley's office and noticed that it would have been possible for J.S. to stand at the table and look out the window while being sodomized, as he had described in his interview at the CAC. (*Id.* at 101). Rigney also obtained Wesley's personnel file from the school. (*Id.* at 149). Notes in the file indicated that Wesley had multiple individual encounters with J.S., which corroborated J.S.'s disclosure that he was alone in Wesley's office on many occasions. (*Id.*).

On February 12, 2009, Campbell and others from the Cabinet for Families and Children returned to Sixth District to interview children that had contact with Wesley. Rigney and another detective with the Covington Police Department also returned to Sixth District to oversee the information collected by the interviewers. At least thirty (30) children were interviewed; none of them mentioned any wrongdoing by Wesley. (Doc. # 80-1 at 4-18).

Rigney and Campbell also attempted to identify the children that J.S. said he heard talking about being abused by Wesley. Because J.S. was not able to identify the children by name during his forensic interview, Rigney wanted to show J.S. pictures of other students to help him identify the potentially-abused students. (Doc. # 81 at 91-92). However, Rigney never had the opportunity to show J.S. the pictures because, as Rigney explained, "[h]e wasn't available. He was sick. He was sick for several weeks. He had strep throat, scarlet fever. By the time we were getting to reschedule this, this case had been dismissed." (*Id.*).

J.S. was physically examined by Dr. Phil Lichtenstein on February 17, 2009. (Doc. # 83 at 58; Doc. # 80 at 106-107). The examination did not reveal any physical trauma consistent with anal sodomy. (Doc. # 81 at 28). These results, however, did not cause Rigney to discredit J.S.'s allegations. (*Id.*). As Rigney explained at her deposition, "we get normal medical exams in 98 percent of our cases for juvenile sexual abuse cases." (*Id.*). Despite the results, and based on her prior experience, Rigney continued to believe that J.S. could have been sodomized and fondled over a period of a year, as he had described, and not shown physical signs of sodomy or other abuse. (*Id.*).

### E.   Cabinet for Families and Children's finding of substantiated abuse and Wesley's subsequent appeal

On March 18, 2009, Campbell concluded her investigation into J.S.'s allegation that he had been abused by Wesley over the course of a year. In her "Assessment/Investigation Conclusion," Campbell stated as follows:

> After consulting with FSOS Erica Steele it was determined there was maltreatment found and this referral is being marked substantiated sexual abuse and closed listing Rick Wesley as the perpetrator. [J.S.] disclosed that on multiple occasions, occurring over a one year period his school counselor, Rick Wesley anally sodomized him and fondled his genitals. An interview with Mr. Wesley was attempted but he did not respond. There is a criminal investigation pending and Covington Police expect to charge Mr. Wesley with sexual abuse in the 1st degree.

(Doc. # 80-1 at 20).

The following day, Campbell sent a Child Protective Service Substantiated Investigation Notification Letter (Doc. # 80-1 at 54) to Janice Wilkerson, finding that J.S.'s claim of abuse or neglect, as defined in K.R.S. § 600.020(1), was substantiated. Campbell's Notification Letter set forth the following factual basis for her finding:

> On February 5, 2009 [J.S.] disclosed to the Cabinet that Mr. Wesley fondled

9

his penis.  On February 11, 2009 at the Children's Advocacy Center [J.S.] further disclosed that on multiple occasions, occurring over a one year period that Mr. Wesley anally sodomized him.

(*Id.*).  The letter also explained that Wesley had the right to request an administrative hearing to challenge her finding.  (*Id.*).  If no hearing was requested, the Department for Community Based Services would place Wesley's name on the state registry for child abuse or neglect perpetrators.  (*Id.*).  If, however, Wesley did request a hearing, his name would not be placed on the registry unless and until the substantiated abuse finding was upheld at the administrative hearing.  (*Id.*).  Although Rigney was not officially copied on this letter, she received a copy of the letter sometime thereafter.[5]

On March 31, 2009, Wesley, through counsel, appealed Campbell's finding of substantiated abuse.  (Doc. # 91 at 22).  In his written appeal, Wesley argued that J.S. was a victim of sexual abuse, but that he had been "abused at the hands of another and the Cabinet has failed to pursue all avenues to rule out another perpetrator."  (*Id.* at 24).  Wesley also asserted that "[t]he mother of the child has simply coached the child to say that it was Mr. Wesley rather than allowing the child to disclose the true perpetrator."  (*Id.*).

### F.    Criminal Investigation

On April 27, 2009, pursuant to the procedure of the Kenton County Commonwealth's Attorney, Rigney submitted an affidavit in support of an arrest warrant for Richard Wesley to Assistant Commonwealth Attorney Stefanie Kastner Durstock.  (Doc. # 81 at 30).  Durstock reviewed and approved the affidavit, and then had Rigney sign the affidavit before a notary public.  (*Id.*).  Rigney's affidavit stated as follows:

---

[5]  The letter contains two date stamps, one for March 21, 2009 and another for April 3, 2009.  It is not clear whether Rigney received the letter on either of these dates, though.

> Affiant states that on February 06, 2009, she was assigned to investigate a Sexual Abuse in the First Degree report. Affiant states that she was contacted by the Cabinet for Health and Family Services in regard to a disclosure that was made by the minor victim J.S., age 7, on February 05, 2009. At that time, J.S. stated that the defendant had fondled his penis while in the defendants [sic] office at 6th District School. The defendant is employed as a school counselor at 6th District School. The minor, J.S., was then scheduled for a forensic interview at the Children's Advocacy Center, at that time the child stated that the defendant had put his private part in his butt. J.S. stated that this took place in Mr. Wesley's office. J.S. described that the defendant pulled down the back of his pants while he was near a blue round table. J.S. also advised that the defendant was squeezing J.S.'s private part. J.S. stated that he was told by the defendant that he would kick him out of school if he told anyone. J.S. stated that this happened more than once.

(Doc. # 83 at 99). The affidavit was submitted to a Kenton County District Judge on April 30, 2009, who found there was "probable cause to believe that between February 2008 and February 2009, [Richard Wesley] committed in Kenton County, Kentucky, Sexual Abuse in the 1st Degree, a Class C Felony . . . ." (Doc. # 83). The judge then issued a warrant for Wesley's arrest. (*Id.*).

Sometime thereafter, Durstock and a victim's advocate met with J.S. to discuss his allegation. (Doc. # 83 at 31). The meeting only lasted approximately two to three minutes because Durstock could not get J.S. to talk. (*Id.* at 34). Based on J.S.'s age and his unwillingness to talk, Durstock feared a judge would likely rule that J.S. was incompetent to testify. (*Id.* at 33). Even more problematic, Durstock was concerned that she would not be able to get J.S. to open up to twelve jurors while testifying at a trial. (*Id.*).

Durstock then reviewed J.S.'s interview at the CAC, although she could not recall the details of the interview during her deposition. (*Id.* at 36).

After interviewing J.S. and watching the interview, Durstock determined that she would recommend to the Kenton County Grand Jury that they return a No True Bill against

Wesley.  (*Id.* at 36-37).  She explained that she made this decision "because J.S. I didn't think would have ever ma[de] it through a competency evaluation.  If I don't have a kid that can make it through a competency evaluation, I don't feel that, as a prosecutor, I have the ability to go forward." (*Id.*).  Even if J.S. were deemed competent, Durstock also doubted that she could convince twelve jurors beyond a reasonable doubt, particularly when there was no physical evidence.  (*Id.* at 79).  Durstock stressed, however, that she did not doubt Rigney's probable cause determination whatsoever.  (*Id.* at 83).  Thereafter, on August 13, 2009, and at the advice of Durstock, the Kenton County Grand Jury returned a No True Bill against Wesley.

### G.    Wesley's § 1983 lawsuit against Rigney and others

On March 12, 2010, Wesley filed the instant action against Detective Rigney and others, asserting claims under 42 U.S.C. § 1983 and Kentucky tort law.  Aside from the claims against other previously-dismissed Defendants (*see* Doc. # 24), Wesley alleged that Rigney unlawfully arrested him in violation of the Fourth Amendment and deprived him of due process as guaranteed by the Fourteenth Amendment.  (Doc. # 1).  By an Amended Complaint, Wesley also alleged that Rigney arrested him in retaliation for appealing the Cabinet's finding of substantiated abuse.  (Doc. # 62).

The Court previously dismissed all claims against Detective Rigney with the exception of Wesley's claim of retaliatory arrest.  *Wesley v. Rigney*, – F. Supp. 2d –, No. 10-51-DLB-JGW, 2012 WL 6600303 (E.D. Ky. Dec. 18, 2012).  The parties have now completed discovery, and Detective Rigney has moved for summary judgment on the remaining claim against her.  (Doc. # 79).  Wesley opposes that motion and also asks that his unlawful arrest claim be reinstated in light of facts learned through discovery.  (Doc. #

12

86).

# III.   ANALYSIS

## A.   Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The "moving party bears the burden of showing the absence of any genuine issues of material fact."  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).  The moving party may meet this burden by demonstrating the absence of evidence concerning an essential element of the nonmovant's claim on which it will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, it must produce specific facts showing that a genuine issue remains.  *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). If, after reviewing the record in its entirety, a rational fact finder could not find for the nonmoving party, summary judgment should be granted.  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).  Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to

13

rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).

## B.   Retaliatory Arrest

In Count XI of the Amended Complaint, Wesley alleges that Rigney sought a warrant for his arrest in retaliation of him filing an administrative appeal of Campbell's substantiated abuse finding.   Wesley points to various circumstantial evidence to prove Rigney's retaliatory intent.   His theory begins with the premise that Rigney and Campbell were friends who often socialized outside of work.   From there, Wesley adds the fact that Campbell specifically chose Rigney to investigate the case after learning of J.S.'s disclosure.   After conducting an investigation and observing J.S.'s interview at the CAC, Rigney chose not to seek a warrant for Wesley's arrest for over two months.  On March 19, 2009, Campbell filed her finding of substantiated abuse.   Wesley subsequently appealed that finding on March 30, 2009.  Wesley surmises that only after his appeal did Rigney file her affidavit seeking an arrest warrant.   These facts, according to Wesley, support an actionable claim for retaliatory arrest.

Detective Rigney has moved for summary judgment on this claim, asserting that she is entitled to qualified immunity.    As the Court stated in its December 12, 2012 Memorandum Opinion and Order:

> "Qualified immunity is an immunity from suit rather than a mere defense to liability." *Pearson v. Callahan*, 555 U.S. 223, 237 (2009).  Once a defendant raises the affirmative defense of qualified immunity, the plaintiff must "offer[] sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Estate of Carter v. City of Detroit*, 403 F.3d 305, 310 n. 2 (6th Cir. 2005).  In analyzing the qualified-immunity defense in the Sixth Circuit, court are instructed to apply a three-part test: (1) whether a constitutional violation occurred; (2) whether the violation was of clearly established law; and (3)

14

> whether the defendant's actions were objectively unreasonable in light of the clearly established law. *Holzemer v. City of Memphis*, 621 F.3d 512, 519 (6th Cir. 2010).

*Wesley*, 2012 WL 6600303, at *6. The Court is also free to address these prongs in any order, *Pearson*, 555 U.S. at 236, and may grant qualified immunity if the plaintiff fails to satisfy any one of these prongs. Here, Plaintiff Wesley has failed, at a minimum, to establish the second prong – a violation of a clearly established right – and Detective Rigney is therefore entitled to summary judgment.

The Court's conclusion that Wesley has not demonstrated a violation of a clearly established right relies on two separate, but related findings. First, Rigney had probable cause to believe that Wesley committed sexual abuse in the first degree when she submitted her affidavit in support of an arrest warrant. Second, at the time of Wesley's arrest, it was not clearly established that individuals had the right to be free from a retaliatory arrest that was otherwise supported by probable cause. *Reichle v. Howards*, 132 S.Ct. 2088, 2093-94 (2012). The Court will begin its analysis with the latter finding.

### 1.    Clearly established law

Within the Sixth Circuit, the elements of a retaliatory arrest claim have remained in flux over the past eleven years. At a minimum, the plaintiff must establish the following three elements: (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights." *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998). However, at times the Sixth Circuit has included a fourth element: a lack of probable cause.

In 2002,  the Sixth Circuit definitively held that individuals have the right to be free from a retaliatory arrest that is otherwise supported by probable cause.  *Green v. Barber*, 310 F.3d 889, 896-97 (6th Cir. 2002).  In 2006, the Supreme Court issued its opinion in *Hartman v. Moore*, 547 U.S. 250 (2006), which changed the course of the Sixth Circuit's retaliatory arrest jurisprudence.  In *Hartman*, the Court held that  individuals do not have the right to be free from retaliatory *prosecutions* unless they were brought without probable cause.  *Hartman*, 547 U.S. at 252.  Thereafter, in *Barnes v. Wright*, 449 F.3d 709, 717-20 (6th Cir. 2006), the Sixth Circuit found that *Hartman* applied to instances where the police officer both arrested the plaintiff and initiated the grand jury proceeding, and was facing claims of both retaliatory prosecution and retaliatory arrest.  However, as the Sixth Circuit stated in *Kennedy v. City of Villa Hills*, 635 F.3d 210, 217 n. 4 (6th Cir. 2011), it has not decided whether lack of probable cause is an element in "ordinary" retaliatory arrest claims post *Hartman*.

While Sixth Circuit law remains unclear on this issue, the Supreme Court recently clarified that it has never recognized a "right to be free from a retaliatory arrest that is otherwise supported by probable cause."  *Reichle*, 132 S.Ct. at 2094.  In *Reichle*, the Court stated that *Hartman* "injected uncertainty into the law governing retaliatory arrests."  *Id.* at 2096.  The Court also recognized that many Circuit Courts, including the Sixth Circuit, applied *Hartman* to retaliatory arrest claims, requiring a plaintiff to prove lack of probable cause in order to recover.  *Id.*  Although the *Reichle* Court clarified that it did not intend to extend *Hartman*'s rule to arrests, it also held that police officers should not be subject to money damages "for picking the losing side of the controversy."  *Id.* (quoting *Wilson v. Layne*, 526 U.S. 603, 618 (1999).

16

Based on Sixth Circuit precedent and *Reichle*, it was not clearly established at the time of Wesley's arrest in 2009 that he had a right to be free from a retaliatory arrest that was otherwise supported by probable cause.  Thus, as Wesley concedes in his response to the motion for summary judgment (Doc. # 86 at 19), Rigney is entitled to qualified immunity on this claim so long as the arrest was, in fact, supported by probable cause.

### 2.    Probable cause

Probable cause to make an arrest exists when "the facts and circumstances known to the officer warrant a prudent man in believing that an offense has been committed." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 248 (6th Cir. 2010) (internal quotations omitted).  This requires a "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion."  *Sykes v. Anderson*, 625 F. 3d 294, 306 (6th Cir. 2010).  The officer must not "cherry-pick facts in determining that probable cause exists."  *Franklin v. Miami Univ.*, 214 F. App'x 509, 514 (6th Cir. 2007).  "'Rather, the officer must consider the totality of the circumstances, recognizing both the inculpatory *and* exculpatory evidence, before determining if he has probable cause to make an arrest.'"  *Id.* (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000)).  This consideration is limited only to the inculpatory and exculpatory information known by the officer at the time the offense is charged.  *Thacker v. City of Columbus*, 328 F.3d 244, 261 (6th Cir. 2003).

The Sixth Circuit recognizes that police officers may rely on an eyewitness identification to establish probable cause with which to sustain an arrest.  *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999).  When an individual makes an accusation that he or she has been sexually abused, that accusation is generally entitled to a presumption of reliability and veracity.  *Id.*; *see also United States v. Harnes*, 453 F.3d 752, 754-55 (6th

17

Cir. 2006) (holding that victim's disclosure directly to police officer of attempted sexual battery, coupled with corroboration that the victim was alone with alleged perpetrator at the time was sufficient to establish probable cause); *Thaker*, 328 F.3d at 257 ("Gallagher's confession that Thacker had abused her alone is sufficient to establish probable cause"). And when a victim discloses that he or she has been sexually abused, the accusation, standing alone, is sufficient to establish probable cause. *Ahlers*, 188 F.3d at 370. The plaintiff may, however, rebut this presumption by showing that the police officer had or should have had reason to think that the identification was in some way untruthful or unreliable. *Id.* at 371.

Pursuant to *Ahlers*, J.S.'s disclosure is entitled to a presumption of veracity and reliability. Rigney observed J.S.'s forensic interview as he disclosed that "Mr. Wesley" "put his private part in [his] butt," and explained that Wesley "squeezed" his genitals "on top of [his] clothes." This disclosure, standing alone, provided probable cause that Wesley committed sexual abuse in the first degree, which is defined as: "subject[ing] another person to sexual contact who is incapable of consent because he or she: . . . [i]s less than twelve (12) years old." K.R.S. § 510.110(1)(b)(2). Wesley's alleged actions also meet the statutory definition of "sexual contact," which is described as "touching of the sexual or other intimate parts of a person done for the purpose of gratifying the sexual desire of either party." K.R.S. § 510.010(7).

J.S.'s disclosure did not end with a bare allegation of sexual abuse. In the interview observed by Rigney, J.S. was able to orient the abuse within the context of his life experiences. J.S., in first grade at the time of the disclosure, explained that the abuse began when he was in kindergarten and living on Greenup Street. He recalled that the

18

abuse continued as he was living in a homeless shelter up to February 5, 2009 when he and his mother were living at a third location.   He also was able to explain why he was in Wesley's office each time the abuse occurred.  According to J.S., he was often sent to Wesley's office by his first grade teacher, Ms. Nelson, if he did "bad stuff."  Other times Wesley himself called J.S. into his office.

J.S. also recalled details of the abuse.  He recalled standing in Wesley's office as the office door was cracked open a few inches.  He recalled standing next to a round, blue table and looking out Wesley's office window as Wesley stood behind him.  He remembered that Wesley's pants were off, and that Wesley pulled the back of his "soft pants" down in order to "put his private part in [J.S.'s] butt."  J.S. described feeling "sad" when this happened and explained that "it don't feel good."  He also remembered that Wesley threatened to kick him out of the school if he told anyone about the abuse; J.S. recognized that Wesley was trying to scare him with these threats.

Through the course of her investigation, Rigney learned additional facts that corroborated and gave credence to J.S.'s disclosure.  Rigney visited Wesley's office and saw that it was possible for J.S. to stand next to a round, blue table and look out the office window while being abused, as J.S. had described in his forensic interview.  Rigney also gathered Wesley's personnel file which revealed that he had many individual encounters with J.S., corroborating J.S.'s disclosure that he was often alone with Wesley in his office. *See Harnes*, 453 F.3d at 755.

Wesley's suspicious behavior gave Rigney additional reason to believe that he abused J.S.  According to M.D., Wesley followed their taxi to NorthKey on February 5, 2009, honking his car horn and waiving as he drove.  When they arrived at NorthKey and

M.D. told Wesley to stay away, Wesley apologized and attempted to justify touching J.S.'s leg.  M.D. also reported that Wesley came to her house on at least two occasions after J.S.'s initial disclosure.  Rigney learned from the Sixth District Principal, Dr. Ross, that school personnel were not permitted to make home visits without the Principal's permission and without being accompanied by a colleague. While Wesley's actions, standing alone, were not incriminating, they were certainly suspicious given J.S.'s allegations.  Ultimately, when the evidence Rigney knew at the time she filed her affidavit is considered in combination, she had probable cause to believe that Wesley committed sexual abuse in the first degree.

In disagreement with this conclusion, Wesley argues that a number of facts known by Rigney, and inferences to be drawn therefrom, would have caused a reasonable officer to doubt that an offense had been committed.  Each of those facts and inferences will be addressed in turn.

First, Wesley responds that his behavior was not suspicious at all, and should not have given Rigney any reason to believe that he committed a crime.  Wesley testified at his deposition that he followed the taxi on February 5, 2009 to ensure J.S. received treatment, because he had concerns that M.D. would not actually take the child to NorthKey.  (Doc. # 82 at 125).  He also wanted to provide support and be available to answer any questions that NorthKey might have.  (*Id.* at 126).  Wesley also disagreed that he ever made any gestures or honked his horn at the taxi while following it to NorthKey. (*Id.* at 132).  Additionally, Wesley testified that he attempted to visit J.S. at home on two occasions, both prior to February 5, 2009, which is in contrast to M.D.'s statement that Wesley came to her house twice *after* February 5, 2009.  (*Id.* at 118).

20

As a general rule, officers are entitled to take "a suspect's satisfactory explanation of suspicious behavior" in "making the determination whether probable cause to arrest exists." *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988).  However, this rule only extends to explanations known to the officer at the time she files her affidavit.  *See Peet v. City of Detroit*, 502 F.3d 557, 565 (6th Cir. 2007) ("The Supreme Court has held that probable cause determinations must be evaluated according to the information the police knew at the moment of the challenged conduct, not information learned for the first time afterwards.").  Because Rigney did not know Wesley's explanation at the time she filed her affidavit, Wesley's justification has no bearing on the probable cause analysis.

This conclusion leads to another argument raised by Wesley – Rigney could not have established probable cause because she failed to interview multiple witnesses, including Wesley.  The Sixth Circuit squarely rejected a similar contention in *Ahlers*, when it held that "an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused" once probable cause is established.  *Ahlers*, 188 F.3d at 371.  The court also held that "law enforcement 'is under no obligation to give any credence to a suspect's story [or alibi] nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause.'"  *Id.* (quoting *Criss*, 875 F.2d at 26).  Because Rigney had probable caused based on the evidence previously discussed, she had no duty to interview other witnesses and certainly had no duty to interview Wesley.

Wesley also contends that at least two of J.S.'s statements during his forensic interview indicate that the child's disclosure was nothing but fantastical.  As Wesley contends, he is approximately 5'10" tall, making it impossible to stand behind a much

shorter seven-year-old child and sodomize him, as J.S. described. Wesley's argument,

though, relies on an unwarranted inference from J.S.'s disclosure. According to Wesley's

theory, it would have been impossible for him to sodomize the child if both were standing

erect. However, that was not J.S.'s testimony. J.S. remembered that he was standing

"straight up" when he was sodomized, although he could not specifically remember how

Wesley was standing. (DVD of February 11, 2009 interview at CAC at 19:30). Instead,

when asked to explain how Wesley was standing, J.S. paused for some time, and could

only remember that Wesley was "standing on his legs." (*Id.* at 20:20). Contrary to the

perception Wesley attempts to create, J.S. never described Wesley as standing straight up.

J.S.'s description of the abuse in no way shows that J.S. was recounting a "fantasy," as

Wesley has described it. (Doc. # 86 at 10). To the contrary, J.S.'s description of Wesley's

body position *vis-a-vis* his own makes an allegation of sodomy quite believable.    In further

support of his assertion that J.S.'s disclosure was nothing more than a "child's fantasy,"

Wesley points to  J.S.'s recollection that he saw his mother, father and sister outside

Wesley's office window as he was being sodomized. Because there is no evidence that

any of those individuals were outside the window, Wesley suggests that this statement also

proves that J.S.'s disclosure was a "child's fantasy that was coached." (*Id.*). While this

specific recollection could not have occurred, it was such a minimal portion of an otherwise

detailed disclosure of sexual abuse that a reasonable, prudent man could have still

believed that the abuse occurred.[6]

_____

[6] Former Assistant Commonwealth's Attorney Stefanie Durstock, who prosecuted numerous child
sexual abuse cases, explained that J.S.'s recollection of seeing his family outside the window gave no
indication that the disclosure on the whole was unreliable. Although she did not remember J.S.'s statement
during his interview at the CAC, she stated that "it doesn't seem crazy to me because he could be having
some thoughts of nice things in his head. I mean, that doesn't seem crazy. I've talked to lots of kids who have

Wesley also challenges J.S.'s statement that the door was cracked open on February 5, 2009 when the abuse allegedly occurred.  Wesley asserts that the door was completely open at all times, which makes it nearly impossible for sexual abuse to have occurred with other adults nearby.  The Court presumes that Wesley makes this factual assertion based on the secretary, Ms. Peri Fischer's affidavit explaining that Wesley's door remained open on February 5, 2009, when J.S. was brought to the office and waited for his parents.  (Doc. # 83 at 106). However, Detective Rigney never interviewed Fischer and never had any indication that Wesley's office door was open.  Because the Court's analysis must focus on information Rigney *knew* at the time she filed her affidavit, Ms. Fischer's affidavit cannot be considered by the Court.

J.S.'s forensic interview aside, Wesley also emphasizes that Rigney knew J.S. suffered from psychological problems, which somehow suggests that the child is not credible.  Specifically, Wesley argues that Rigney knew J.S. had previously been hospitalized for eight days due to psychological problems, and that he was attempting to commit suicide on February 5, 2009 before the alleged abuse occurred.  This argument is only half true.  Rigney did not know that J.S. had been hospitalized at the time she submitted her affidavit in support of an arrest warrant; she only knew that J.S. had attempted to stuff sweat bands down his throat on February 5, 2009.  (*See* Doc. # 81 at 74).  This misstatement aside, there is absolutely no evidence of record to suggest that J.S. distorted the truth as a result of his psychological problems.  At most, Rigney generally admitted during her deposition that she *might* be concerned whether a child victim was

---

been sexually abused.  It doesn't sound – it probably sounds crazy to you, but it doesn't sound crazy to me." (Doc. # 83 at 69).

telling the truth if he or she suffered from psychological disturbances. (Doc. # 81 at 29-30). However, when she was specifically about J.S.'s suicide attempt, Rigney explained that it was most likely the product of being abused by Wesley rather than an indicator of dishonesty. (Doc. # 81 at 81). In short, Wesley has not shown that Rigney knew J.S. was suffering from any psychological illness affecting his honesty and veracity at the time she filed her affidavit in support of an arrest warrant.

Additionally, Wesley argues that the prosecutor, Stephanie Durstock, recommended that the Kenton County Grand Jury return a No True Bill against Wesley, which demonstrates that others doubted Rigney's probable cause finding. However, Durstock's own deposition testimony refutes this assertion. Durstock explained that she recommended a No True Bill because she thought J.S. would be deemed incompetent to testify, making it impossible to prove her case beyond a reasonable doubt. Importantly, though, Durstock unequivocally stated that she did not doubt that Rigney had probable cause; if she had concerns, she would never have allowed Rigney to seek an arrest warrant. (Doc. # 83 at 38). Thus, Durstock's deposition testimony adds no force to Wesley's argument.

Finally, Wesley relies on the opinion of his expert witness, Wayne A. Wallace, to argue that there was not probable cause to support his arrest. Wallace, a twenty-year law enforcement veteran, reviewed information both known and unknown to Rigney, and used that information to form an opinion on whether there was probable cause. Wallace opined as follows:

> It was abundantly clear that considering the totality of circumstances and all of the evidence known by, or available to detective Rigney on April 27, 2009 no probable cause existed to proceed with charges against Richard Wesley.

24

> No reasonable person, and certainly no reasonable criminal investigator, could believe there was a reasonable belief that Richard Wesley sexually abused JS in any way.

(Doc. # 54-1 at 12).

Wesley's reliance on Wallace's opinion is misplaced for two reasons. First, and most significantly, Wallace formed his opinion, in part, after reviewing information that Rigney did not know at the time she submitted her affidavit. For example, Wallace reviewed the affidavit of Secretary Peri Fischer and conducted a separate interview of her, and also reviewed J.S.'s discharge and aftercare appointment sheet from his extended stay at Mercy Hospital. Rigney did not review either of these documents, nor did she interview Peri Fischer. In determining probable cause, the court must only assess "the facts and circumstances known at the time the offense is charged." *Thacker*, 328 F. 3d at 261. Because Wallace's opinion is based in part on facts unknown to Rigney when she filed her affidavit, it cannot be considered in determining whether probable cause existed.

Additionally, the Federal Rules of Evidence would likely require that his opinion on probable cause be excluded from the jury's consideration. Federal Rule of Evidence 704 permits an expert witness to offer his or her opinion on the ultimate issue to be decided by the trier of fact. *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994). However, an expert is not permitted to express an opinion on a legal conclusion. *DeMerrell v. City of Cheboygan*, 206 F. App'x 418, 426 (6th Cir. 2006). Whether a set of facts establishes probable cause is a quintessential question of law and, therefore, outside the province of expert testimony. *See Hale v. Kart*, 396 F.3d 721, 728 (6th Cir. 2005) ("When no material dispute of fact exists, probable cause determinations are legal determinations that should be made by a court."). Because Wallace's opinion on the ultimate issue of law – whether

25

there was probable cause – likely could not be considered by the jury, it also shall not be considered by the Court at this summary judgment at stage. *See DeBiasi v. Charter County of Wayne*, 537 F. Supp. 2d 903, 911-12 (E.D. Mich. 2008) (explaining that the majority of circuits have interpreted the Supreme Court's decision in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) to permit consideration of evidence submitted at summary judgment in non-admissible form when the evidence will be reduced to admissible form at trial). For each of these reasons, Wallace's opinion does not aid the Court in determining whether probable cause was present.

In the end, the probable cause standard is the "lightest" burden of proof in our judicial system, *Howell v. Sanders*, 755 F. Supp. 2d 789, 791 (E.D. Ky. 2010), and only requires a "fair probability" on which reasonable and prudent people act. *Florida v. Harris*, 133 S.Ct. 1050, 1055 (2013). Considering the totality of the evidence known to Rigney at the time she filed her affidavit, there is no doubt that a prudent person would find a "fair probability" that Wesley committed sexual abuse in the first degree. Rigney properly relied on J.S.'s disclosure and other corroborating evidence to make this probable cause finding. *See Ahlers*, 188 F.3d at 370. In addition, Wesley, as the party attacking this probable cause determination, has failed to put forth evidence known to Rigney which would have given reason to believe that J.S. was being untruthful. *Id.* at 371. Because Rigney had probable cause to believe that Wesley committed a crime, and because it was not clearly established at the time of Wesley's arrest that he had the right to be free from a retaliatory arrest that was otherwise supported by probable cause, Rigney is entitled to qualified immunity.

26

### C.     Informal motion to reinstate false arrest claim

The Court previously dismissed Wesley's false arrest claim finding that he failed to plead a viable claim under Federal Rule of Civil Procedure 12(b)(6).  *Wesley v. Rigney*, – F. Supp. 2d –, No. 10-51-DLB-JGW, 2012 WL 6600303, at *6-13 (E.D. Ky. Dec. 18, 2012). More specifically, the Court held that Rigney was entitled to qualified immunity because it was objectively reasonable to believe she had probable cause that Wesley committed sexual abuse in the first degree.  *Id.* at *9-11.  However, the Court did not go so far as to hold that Rigney did, in fact, have probable cause in its prior written decision.   In his response to the motion for summary judgment, Wesley argues the Court should reinstate his false arrest claim, finding that his arrest was not supported by probable cause and that it was not otherwise reasonable for Rigney to believe that she had probable cause.

Wesley's informal motion will be denied for two reasons.  First, it would be improper for the Court to reinstate a claim that was previously dismissed pursuant to Civil Rule 12(b)(6) at this juncture.  "The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true."  *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993).  The Court concluded that Wesley failed to meet that initial burden, and Wesley has not demonstrated any error in the Court's holding.  Therefore, it would be improper for the Court to reinstate Wesley's unlawful arrest claim at this juncture.  Second, and more importantly, the Court has held that Rigney did have probable cause to believe that Wesley sexually abused the child.  Therefore, it would be futile to reinstate Wesley's false arrest claim, which turns on the probable cause determination.  For each of these reasons, Wesley's informal motion will be denied.

## IV.   CONCLUSION

Accordingly, for the reasons set forth herein, **IT IS ORDERED** that:

(1)      Defendant's Motion for Summary Judgment (Doc. # 79) is hereby **GRANTED**;

(2)      Plaintiff's informal motion to reinstate his wrongful arrest claim is hereby **DENIED**;

(3)      A Judgment in favor of Defendant Rigney will be entered contemporaneously herewith.

This 18th day of June, 2013.



Signed By:
*David L. Bunning*
United States District Judge

G:\DATA\Opinions\Covington\2010\10-51 MOO granting MSJ.wpd