## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION
## AT COVINGTON

**CIVIL ACTION NO. 10-51-DLB-JGW**

**RICHARD WESLEY**                                                                    **PLAINTIFF**


**vs.**                              <u>**MEMORANDUM OPINION & ORDER**</u>


**JOANNE RIGNEY**                                                                   **DEFENDANT**

*************************

This matter is before the Court on Defendant Joanne Rigney's Renewed Motion for Directed Verdict (Doc. # 163) and Motion to Alter, Amend, or Vacate for a New Trial (Doc. # 164).   Plaintiff Richard Wesley has filed his responses (Docs. # 168 & 169) and Defendant has filed her replies (Docs. # 172 & 174), making the motions ripe for review. Having reviewed the parties' briefings, both of Defendant's motions will be **denied** for the reasons stated herein.

**I.      Factual and Procedural Background**

This case has a long factual and procedural history that has been recounted several times not only by this Court, but also by the Sixth Circuit Court of Appeals.   Accordingly, this review will be brief.

The events underlying this action occurred in early 2009.  Plaintiff Richard Wesley was working as a behavioral intervention specialist at 6th District Elementary School in Covington, Kentucky.  Wesley, a native Cincinnatian, had worked his way through college and graduate school, and was in his first year at 6th District, where he counseled troubled

1

students.  During this time, he counseled J.S., an extremely troubled young boy with a long history of psychological disturbances.  On February 5, 2009, J.S. was brought to Wesley's office after trying to suffocate himself by shoving arm bands down his throat.  Wesley recommended, as he had before, that J.S. be taken to NorthKey for a mental evaluation. J.S.'s mother showed up to the school, and she and J.S. took a taxi together to NorthKey. Wesley followed them.

The first allegation against Wesley occurred in the NorthKey parking lot.  While only J.S. and his mother – and potentially the taxi driver, who was never interviewed – will ever know what transpired during that fateful ride, nothing was the same for Wesley from those moments forward.   Upon arrival at NorthKey, Wesley was berated by J.S.'s mother, who made broad and vague accusations against Wesley.   Through several rounds of subsequent interviews with J.S., his accusations would roughly crystalize.  J.S. claimed that, over the course of a year, Wesley had repeatedly anally sodomized him.

Defendant Joanne Rigney, a detective with the Covington Police Department, was assigned to investigate the allegations against Wesley.  Defendant was a zealous advocate for child victims.  She would later testify that it "was her job to believe the child."  This principle evidently guided her investigation, perhaps to a fault.

Over the course of the investigation, Defendant was unable to uncover any evidence that corroborated J.S.'s claims.  J.S.'s medical evaluation showed no signs of abuse.  The other children with whom Wesley worked were interviewed and did not disclose any abuse or other improper conduct.  What is more, J.S.'s statements were inconsistent and implausible.   J.S. struggled to tell a consistent story – something that is certainly understandable when one is dealing with a young, disturbed child who may have been

sexually abused.  But his claims seemed fantastical as well.  He claimed that Wesley sodomized him with the office door open.  Wesley's office, however, was in the middle of a busy area of the school.  Additionally, J.S.'s description of the alleged rape was anatomically infeasible, given the heights of the J.S. and Wesley.

While none of these facts singularly disproved the claims against Wesley, they did, taken together, make it seem very unlikely that the abuse described by J.S. actually occurred.  Despite this, some eighty-four days after J.S.'s initial disclosure and months after the last interview of a student or J.S., Wesley was arrested.

The trauma of being arrested for a crime he did not commit was devastating for Wesley, who had struggled with mental illness for years prior to these events.  In addition to the personal anguish of such despicable allegations, Wesley had to deal with the societal ones as well.  He was dismissed from his job for his alleged crimes, though the school later sent Wesley a letter stating  that he was released due to a "loss of funding" for his position.

The criminal case against Wesley was ultimately dismissed after the prosecutor sought a No True Bill.  But the damage was done.  Wesley had lost his job, and until the erroneous charges were expunged from his record, he would be unemployable.  Although he has a new life far from his home in Cincinnati, he still cannot work with children.  Instead, he is counselor at a hospice facility.

Wesley filed a civil rights action pursuant to 42 U.S.C. § 1983 against several individuals in March of 2010.  The Court adjudicated several pre-trial motions, leaving Rigney as the sole defendant.  Wesley's remaining claims against her were two-fold. First, he claimed wrongful arrest under the Fourth Amendment.  Second, Wesley stated a claim for retaliatory arrest under the First Amendment.  This Court initially dismissed both of

those claims on qualified immunity grounds.  However, the Court of Appeals reversed the dismissal of Wesley's case, finding that qualified immunity did not shield Defendant from trial.

On December 15, 2015, nearly seven years after the initial allegations, a jury returned a verdict in Wesley's favor on his wrongful arrest claim.  The jury awarded him $569,000 in compensatory damages and $500,000 in punitive damages.

After entry of the Judgment, Defendant filed the two motions pending before the Court: a Renewed Motion for Directed Verdict and a Motion to Alter, Amend, or Vacate the Judgment for a New Trial.  Each Motion shall be addressed in turn.

## II.    Defendant's Renewed Motion for Directed Verdict

### A.    *Standard of Review*

A renewed motion for directed verdict may only be granted where, "when viewing the evidence in a light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Rhinehimer v. U.S. Bancorp Investments, Inc.*, 787 F.3d 797, 804 (6th Cir. 2015) (quoting *Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005)).[1]  Evidence should not be weighed nor the credibility of witnesses questioned; the court must not substitute its judgment for that of the jury.  *Id.* (quoting *Balsley v. LFP, Inc.*, 691 F.3d 747, 757 (6th Cir. 2012)).

---

1)  Defendant's first motion is a renewed motion for directed verdict pursuant to Fed. R. Civ. P. 50(b).  Defendant first properly raised a motion for directed verdict at trial (Doc. # 154), as is required by the rule.  That motion was denied, and within twenty-eight days  after the entry of judgment, Defendant filed the instant motion.

**B.** *Analysis*

In her renewed motion for directed verdict, Defendant argues she is entitled to a directed verdict on two issues.  First, she claims that she was entitled to qualified immunity.  Second, Defendant contends that punitive damages should not have been submitted to the jury.

## 1.    Defendant was not entitled to qualified immunity.

Even though the Sixth Circuit previously determined that Defendant was not entitled to qualified immunity in this case, *Wesley v. Campbell*, 779 F.3d 421 (6th Cir. 2015) (holding that Defendant was not entitled to qualified immunity on either the unlawful arrest or the retaliatory arrest claims), the qualified immunity defense does not vanish after it is denied summarily.  *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011).   "Rather, after summary judgment is denied, the question becomes whether the evidence presented at trial is sufficient to overcome the defense." *Ayers v. City of Cleveland*, 773 F.3d 161, 167 (6th Cir. 2014) (citing *Ortiz,* 562 U.S. at 184).

Defendant provides two reasons why she is entitled to qualified immunity in this case.  First, she claims that, viewing the facts in a light most favorable to Wesley, there is sufficient evidence to support a finding of probable cause.  Second, even if probable cause did not exist in this case, she argues that a reasonable officer could have believed that it did, requiring the Court to find that Defendant was entitled to qualified immunity.

Based on the full record developed at trial, Defendant is still not entitled to a qualified immunity defense.  The qualified immunity defense shields public officials from liability where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Citizens in Charge, Inc. v. Husted*, 810

5

F.3d 437, 440 (6th Cir. 2016) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Thus, the qualified immunity inquiry is two-fold: (1) whether, considering the facts alleged

in a light most favorable to the non-moving party, a constitutional right has been violated;

and (2) whether that right was clearly established. *Everson v. Leis*, 556 F.3d 484, 494 (6th

Cir. 2009); *see also Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013)

(noting the same "two-tiered" inquiry for qualified immunity) (citing *Austin v. Redford Twp.

Police Dep't*, 690 F.3d 490, 496 (6th Cir. 2012)).

Here, the pre-existing law is not in controversy – courts have long held that

individuals enjoy the right to be free from unlawful arrest.[2] *Logsdon v. Hains*, 492 F.3d 334,

343-44 (6th Cir. 2007) (holding that the law is clearly established that a police officer may

not arrest someone without probable cause); *accord Gardenhire v. Schubert*, 205 F.3d 303,

312-313 (6th Cir. 2000) ("There is no question that . . . the law [is] clearly established that,

absent probable to believe that an offense had been committed, or was being committed,

or was about to be committed, officers may not arrest an individual."); *Estate of Dietrich v.

Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999).  It is also well settled that an officer cannot

use a facially valid warrant as a shield to liability, where the officer seeking the warrant

makes misrepresentations or omissions about material facts in the warrant application.

*See Sykes v. Anderson*, 625 F.3d 294, 312 (6th Cir. 2010) (finding that officers cannot rely

on judicial determinations of probable cause when that determination was premised on the

officer's material misrepresentations to the court); *see also Vakillian v. Shaw*, 335 F.3d 509,

517 (6th Cir. 2003) (holding that an "officer cannot rely on a judicial determination of

---

2) Because the jury did not find for Wesley on the retaliatory arrest claim, the parties have not briefed, and the Court will not analyze, the retaliatory arrest claim.

probable cause if that officer knowingly makes false statements and omissions to the judge such that but for these falsities the judge would not have issued the warrant.").  Because the law is clear in this area, Defendant's motion presents a sufficiency-of-the-evidence issue.  Specifically, Defendant claims that there was insufficient evidence to support a finding that probable cause did not exist in this case.[3]  The evidence produced at trial, viewed in a light most favorable to Wesley, precludes a finding of qualified immunity.

An officer has probable cause for an arrest "when, at the moment the officer seeks the arrest, the facts and circumstances within the officer's knowledge and of which she had reasonably trustworthy information are sufficient to warrant a prudent [person] in believing that the plaintiff had committed or was committing an offense."  *Wesley*, 779 F.3d at 429 (citing *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964)).  Here, much, if not all, of the probable cause inquiry turns on whether J.S.'s statements were reasonably trustworthy. *See Gardenhire*, 205 F.3d at 318 (holding that information relied upon must be reasonably reliable).  Viewed in a light most favorable to Wesley, they were not.

J.S. statements were uncorroborated.  Nothing discovered during the course of Defendant's investigation corroborated J.S.'s serious allegations.  His medical examination was negative.  None of Wesley's other students disclosed any abuse.  Not a single employee at 6th District reported any unusual behavior or other evidence corroborating J.S.'s claims.  While Defendant testified that she also considered Wesley's behavior during and after the trip to NorthKey – namely, his alleged honking at the taxi J.S. and his mother took to the facility and his alleged appearance at their home in the aftermath of the

---

3) Defendant's motion raises only a lack of evidence supporting probable cause as grounds for qualified immunity.  Thus, the Court will not examine the remaining elements of the unlawful arrest claim, which relate to the material omissions from Defendant's arrest warrant application.

7

allegations – these facts, which were in dispute during the trial, do not corroborate J.S.'s allegations.   Rather, they are disputed bits of circumstantial evidence, insufficient to overturn the jury's verdict in this case.

J.S. also struggled to tell a consistent story during the course of his interviews, and, while this fact may not be necessarily unusual in child abuse cases, when coupled with the implausibility of his allegations, it cuts against a finding of probable cause.  Specifically, J.S. ultimately changed his story, and claimed that Plaintiff anally sodomized him in his office during the middle of the day, potentially with the door open.  Given these facts, and viewed in a light most favorable to Wesley, a reasonably prudent person would not have believed that Wesley committed the crime charged.

Some cases require the Court to examine probable cause by comparing the allegations contained in the arrest warrant to a hypothetical warrant with the omitted facts included.  *See Sykes*, 625 F.3d at 305.  What such an inquiry really asks is a question that the jury and this Court have already answered: at the time she sought the warrant, did Defendant actually have probable cause? If the answer is yes, there can be no unlawful arrest claim and the officer's misrepresentations or omissions do not matter.  However, as the jury found and the Court detailed above, that answer in this case is no.

Next, Defendant argues that, even if probable cause was lacking for Wesley's arrest, Defendant is entitled to qualified immunity because a reasonable officer could have believed that there was probable cause for the arrest in this case.  Defendant, however, is focused on the wrong inquiry.  This case differs from a "standard" unlawful arrest claim because Defendant was relying a facially valid arrest warrant.   Although an arrest warrant would normally shield an officer from liability, the law recognizes that the officer who applies

8

for the warrant "cannot rely on a judicial determination of probable cause if that officer knowingly makes false statements and omissions to the judge such that but for these falsities the judge would not have issued the warrant." *Vakillian*, 335 F.3d at 517 (quoting *Yancey v. Carroll Cnty.*, 876 F.2d 1238, 1243 (6th Cir. 1989). To overcome an officer's entitlement to qualified immunity in these cases, the plaintiff must establish: (1) a substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth; and (2) that the allegedly false or omitted information was material. *Id.*

While an absence of probable cause is one element that Wesley had to prove in his unlawful arrest claim, the relevant question on the second prong of the qualified immunity inquiry does not concern a reasonable officer's opinion on the existence of probable cause. Rather, it is whether a reasonable officer would have known that intentionally or recklessly omitting material information from an arrest warrant application violates another's rights.

In this case, the omissions from the arrest warrant were deliberate; Defendant selected which facts she would include and which she would omit. And the omitted ones were most certainly material. A neutral magistrate, in determining whether probable cause existed for an arrest, would want to that know that an eyewitness exhibited many characteristics that made his statements unreliable; if the magistrate knew that the sole eyewitness was unreliable, it is very likely that she would not issue the warrant. *See Logsdon*, 492 F.3d at 343 (holding that an eyewitness must be "reasonably trustworthy" for his statements to create probable cause for an arrest); *see also Vakillian*, 335 F.3d at 517 (holding that a plaintiff needs to show that the warrant would not have been issued but-for the misrepresented or omitted material facts). Defendant also failed to include the absence

of other disclosures, the fantastical elements of J.S.'s claims, J.S.'s negative medical examination, and the lack of any other corroborating evidence.  She did not inform the magistrate that no one from the school had seen or heard anything suspicious, despite J.S. claiming to have been raped in Plaintiff's centrally located office during the school day with the door open.  A reasonable officer would have known that omitting these facts from her arrest warrant would cause the magistrate to issue a warrant that would not be issued otherwise.  *See id.*

To the extent that Defendant insists that the word "every" be placed before "reasonable official," the Court is not persuaded that the inclusion of the word changes the standard.  At best it is redundant – that every reasonable official would have done something just means that the conduct was, indeed, reasonable.  At worst it is an attempt to insert subjectivity into the qualified-immunity reasonable-official analysis, which has been explicitly forbidden by this Circuit as well as the Supreme Court.  *Crawford-El v. Britton*, 523 U.S. 574, 587-89 (1998) (holding that evidence of an official's subjective intent is irrelevant for the qualified immunity inquiry) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)); *see also Blake v. Wright*, 179 F.3d 1003, 1008 (6th Cir. 1999) (holding that the qualified-immunity reasonable-officer inquiry is an objective standard, which makes the official's subjective intent irrelevant).

Having viewed the facts presented at trial in a light most favorable to Wesley, the Court finds that Defendant was not entitled to qualified immunity.

## 2. The Court properly submitted the issue of punitive damages to the jury.

Defendant also claims that there was no genuine issue of material fact that

warranted submitting punitive damages to the jury.  Punitive damages may be awarded in a § 1983 case "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *King v. Zamiara*, 788 F.3d 207, 216 (6th Cir. 2015) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).

During the trial, Wesley presented a considerable amount of evidence to suggest that Defendant's actions were reckless as to his Fourth Amendment rights.  First, there was the eighty-four day period between the initial abuse disclosure and arrest, the bulk of which was not spent investigating Wesley.  Next, there was the lack of corroborating evidence and the inconsistent statements by J.S.  Additionally, Defendant failed to interview other school officials and employees who worked near Wesley's office.  Finally, Defendant's omissions from her arrest warrant application and her testimony that it was her job to believe the child further support a finding of recklessness.  Thus, the Court finds that there was a genuine issue of material fact as to the recklessness of Defendant's actions, warranting submission of the punitive damages question to the jury.

For the reasons stated above, the Court **denies** Defendant's Renewed Motion for Directed Verdict in full.

### III.   Defendant's Motion to Alter, Amend, or Vacate for a New Trial

#### A.   *Standard of Review*

Defendant's second motion is one to alter, amend, or vacate for a new trial, pursuant to Federal Rule of Civil Procedure 59, which allows courts to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  Courts have interpreted this language to mean that a

11

new trial is appropriate when the jury reaches a "seriously erroneous result as evidenced by (1) the verdict being against the clear weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *Decker v. GE Healthcare Inc.*, 770 F.3d 378, 394-95 (6th Cir. 2014) (quoting *Cummins v. BIC USA, Inc.*, 727 F.3d 506, 509 (6th Cir. 2013)).  "New trials are not to be granted on the grounds that the verdict was against the weight of the evidence unless that verdict was unreasonable." *Decker*, 770 F.3d at 395 (quoting *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 820-21)). Stated differently, if a reasonable juror could reach the challenged verdict, a new trial is improper.  *Owens-Corning Fiberglas*, 201 F.3d at 821 (citing *Holmes v. City of Massillon*, 78 F.3d 1041, 1048 (6th Cir. 1995)).

B.    ***Analysis***

Defendant gives six reasons why her motion should be granted.  She claims that: (1) the Court should have instructed the jury to consider the issue of qualified immunity; (2) the Court erroneously instructed the jury to consider, as part of its probable cause assessment, Defendant's failure to disclose J.S.'s history of psychological problems, when all the witnesses who testified on that issue said that J.S.'s psychological history did not affect his reliability; (3) the misconduct of Plaintiff's counsel was unduly prejudicial; (4) the punitive damage award is against the weight of the evidence; (5) the amount of punitive damages shocks the conscience; and (6) the compensatory damages award is not supported by credible evidence.  For the reasons stated below, each of these issues, independently or collectively, fails to warrant disturbing the jury's verdict.

12

### 1. The Court did not err by failing to instruct the jury on the issue of qualified immunity.

Defendant claims that the Court erred by not instructing the jury on the issue of qualified immunity. In order for the failure to give an instruction to require a new trial, the omitted instruction must: (1) be a correct statement of the law; (2) not be substantially covered by other delivered charges; and (3) impair the requesting party's theory of the case. *Decker*, 770 F.3d at 396 (quoting *Cummins*, 727 F.3d at 510); *see also Taylor v. TECO Barge Line, Inc.*, 517 F.3d 372, 387 (6th Cir. 2008) (delineating the same three factors for consideration of jury-instruction omissions). Defendant would need to meet all three elements to justify reversal, but she has failed to meet even one.

First, the question of qualified immunity should not have been presented to the jury. While some of the Sixth Circuit's decisions seem to suggest that qualified immunity may sometimes be a question for the jury, a careful reading of those cases makes one question whether they truly stand for that proposition. *See Fisher v. City of Memphis*, 234 F.3d 312, 317 (6th Cir. 2000) ("Where . . . the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge must determine liability.") (quoting *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 902 (6th Cir. 1998); *see also Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004). These cases say that, when there is a genuine dispute of material fact, qualified immunity should be presented to the jury so that it may determine *liability*. In fact, this Circuit has held that it is improper to submit qualified immunity to the jury under general jury instructions. *Pouillon v. City of Owosso*, 206 F.3d 711, 718 (6th Cir. 2000). While certain questions of fact may be relevant to the qualified immunity determination (i.e., did the officers undertake the alleged

actions), the ultimate question of law – could a reasonable police officer have believed that her actions did not violate the plaintiff's constitutional rights – should be determined by the judge. *Id.*

Further, any defense presented to the jury cannot be qualified immunity, because the doctrine is an entitlement from suit, rather than a mere defense to liability. *Hunter v. Bryant*, 502 U.S. 224, 227-28 (1991); *see also Mitchell v. Forsyth*, 472 U.S. 511, 525-26 (1985) (noting that qualified immunity is an immunity from suit rather than a mere defense to liability). Qualified immunity is a compromise position between rectifying the harm caused by constitutional injuries and limiting the adverse societal effects of lawsuits against public officials. *Champion*, 380 F.3d at 900 (citing *Harlow*, 457 U.S. at 814). Qualified immunity presents a hurdle for plaintiffs to clear before their case can go to trial. Moreover, the qualified immunity standard is incongruent with the function of juries. It asks the decision-maker to view the evidence in a light most favorable to the non-movant, a task a jury is never asked to undertake. Thus, at trial the issue for the jury is not truly one of qualified immunity; instead, it is whether the plaintiff has proved his or her case.

While qualified immunity may be re-raised at trial as a defense, that does not change the legal nature of the question. And there may be a rare case where a factual issue related to qualified immunity is so intertwined with the legal question that the resolution of that legal question first requires a jury to settle some factual dispute.[4] Such a case is not

---

4) There is a small subset of cases in which a factual determination by a jury may be necessary in order to properly characterize the capacity under which an officer was operating. *See McKenna v. Edgell,* 617 F.3d 432, 441-43. This fact determination will tell the court what legal standard should apply to the officer's conduct in making the court's determination regarding qualified immunity. For example, a jury might be asked to determine if an officer was acting in a law-enforcement or emergency-responder capacity. *Id.* These threshold determinations by the jury do not determine qualified immunity; rather, they simply aid the court in answering the legal question.

present here.

Even if it would have been proper to submit some portion of the qualified immunity question to the jury, the factual issue that it would have been charged with deciding was substantially covered by the other instructions.  In considering the unlawful arrest claim, the jury was given very specific instructions regarding probable cause.  Those instructions presented several factors, previously identified by the Sixth Circuit in its reversal decision, to aid the jury determining whether J.S. was reliable.  Because the jury found for Wesley on the unlawful arrest claim, they necessarily decided the issue of probable cause in his favor as well.  Additionally, the instructions required the jury to consider whether Defendant intentionally or recklessly omitted facts from her warrant application, and whether those omissions were material.  These are the same factual questions that the jury would have been tasked with deciding had the Court submitted special instructions on qualified immunity.

Finally, the failure to include qualified immunity in a jury instruction did not impair Defendant's case.  She was still able to argue that probable cause existed for the arrest, which would have negated her liability for the unlawful arrest claim.  Further, she was able to argue that her omissions were unintentional, not reckless, and immaterial.  In short, all of the factual issues that could have relieved Defendant of liability were submitted to the jury, and she was permitted  to re-raise her qualified immunity defense to the Court, which it denied above.

_____

These cases conform to the general principle that qualified immunity is a question of law for the court, but leave open the possibility that a jury may be called on to help aid that decision in certain cases.

15

**2.    The Court did not err by instructing the jury to consider J.S.'s history of psychological problems when determining his reliability.**

Defendant also challenges the Court's decision to instruct the jury to consider J.S.'s history of psychological problems when determining his reliability because she claims that all the witnesses who testified said that a child's psychological history was irrelevant in determining his reliability.  However, the Court finds that J.S.'s mental health issues were a proper consideration for the jury in determining whether J.S. was reasonably trustworthy.

"The instructions given by the judge to the jury should be directly applicable to the facts in evidence.  There must be testimony tending to raise the question in order for an issue to be submitted to the jury." *Clarksville-Montgomery Cnty. Sch. Sys. v. U.S. Gypsum Co.*, 925 F.2d 993, 1003 (6th Cir. 1991).  Defendant claims that "there was no evidentiary basis" for the Court to instruct the jury to consider J.S.'s psychological issues.  In support of this proposition, she claims that all of the witnesses who testified on the matter stated that mental health issues do not necessarily make a child unreliable.

However, the  jury was not bound to believe or credit the testimony of these witnesses.  When testimony is inherently contrary or attended by some circumstance that would render a jury disregarding it reasonable, the jury may be free to disregard it. *Chesapeake & Ohio Ry. Co. v. Martin*, 283 U.S. 209, 220-21 (1931) (holding that where evidence is uncontradicted, but, in its very nature, is surprising or suspicious, a jury should be permitted to decide how to credit it, rather than giving such evidence conclusive weight). J.S.'s reliability was undoubtedly an important part of the jury trial, and the importance of his psychological problems was very much in issue.  Moreover, when the Sixth Circuit remanded this case for trial, the panel stated that J.S.'s history of psychological

16

disturbances as a factor affecting his reliability. *Wesley*, 779 F.3d at 430.  The jurors were permitted to employ their common sense and life experiences in making this credibility determination, and may have decided that they believed J.S.'s history of mental health issues was a reason to be suspicious of his reliability, despite what the witnesses said. They were free to do so.

### 3.   Plaintiff counsel's alleged misconduct did not have an unduly prejudicial effect.

Next, Defendant asks for a new trial due to alleged misconduct by Plaintiff's counsel during the trial.  A new trial should be granted on grounds of counsel or party misconduct only where there is a "reasonable probability that the verdict of the jury has been influenced by such conduct."  *City of Cleveland v. Peter Kiewet Sons' Co.*, 624 F.2d 749, 756 (6th Cir. 1980) (quoting *Twatchman v. Connelly*, 106 F.2d 501, 509 (6th Cir. 1939)).  In determining whether there is a reasonable probability that the verdict was influenced by improper conduct, the Court must examine the claim using a totality-of-the-circumstances test, which considers: (1) the nature of any allegedly improper conduct; (2) the frequency of such conduct; (3) the relevancy of the conduct to the issues before the jury; (4) the manner in which the parties and the Court treated the conduct; (5) the strength of the case; and (6) the verdict itself.  *Tompkins v. Crown Corr, Inc.*, 726 F.3d 830, 835 (6th Cir. 2013) (quoting *Peter Kiewit*, 624 F.2d at 756).  Defendant must make a "concrete showing that the misconduct of counsel consistently permeated the entire trial from beginning to end." *Sutkiewicz v. Monroe Cnty. Sheriff*, 110 F.3d 352, 361 (6th Cir. 1997).

Here, Defendant alleges that three separate instances of misconduct had the cumulative effect of prejudicing her and altering the verdict.  First, she argues that during

*voir dire* counsel asked the jury to "make a contract" – an impermissible extraction of a promise. Second, she claims that it was improper for counsel to state, during his opening statement, that the jury should "send a message to the community." And lastly, she takes issue with counsel's reference during his closing arguments to media coverage of this episode, when no evidence of any media coverage had been introduced at trial.

While these comments were improper, their nature is not prejudicial enough to warrant a new trial. Moreover, the comments were infrequent and only tangentially related, at best, to the issues before the jury. Defendant objected to the comments when made, the Court sustained those objections, and Plaintiff's counsel complied with the Court's directives. Plaintiff's case was strong, and the jury's verdict was reasonable. Neither the verdict nor the size of the award indicates any influence from Plaintiff's counsel's misconduct.

### 4.    Punitive damage award is not against the weight of evidence.

Defendant claims that the punitive damage award in this case is against the weight of the evidence. In a § 1983 action, punitive damages are appropriate when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves a reckless or callous indifference to the federally protected rights of others. *King*, 788 F.3d at 216 (citing *Smith*, 461 U.S. at 56). The jury's decision to award punitive damages should not be disturbed unless that decision was unreasonable, meaning so against the weight of the evidence that no reasonable jury could have reached the verdict.

During the trial, Wesley offered sufficient proof for a jury to find that Defendant acted recklessly or callously with regard to his constitutionally protected rights. As mentioned previously, there was evidence highlighting Defendant's lack of thoroughness in her

18

investigation, as well as evidence that she turned a blind-eye to exculpatory evidence. Additionally, the length of time between the initial abuse disclosure and the arrest, most of which was not spent investigating Wesley, further buttressed a finding of recklessness by the jury.

### 5.   Punitive damage award is not excessive.

Defendant next argues that, even if the decision to award punitive damages is supported by the evidence, the amount awarded is excessive.   She argues that the damages award is excessive under either a common-law or constitutional standard.   The former is a challenge to the factual support for the award; the latter, a legal challenge to the award that assumes all relevant facts are true.   Each standard will be addressed in turn.

### i.   *Common-Law Standard*

The common-law standard, as Defendant styles it, will find a damages award excessive if it is: (1) beyond the range supportable by proof; (2) so excessive as to shock the conscience; or (3) the result of a mistake.  *Gregory v. Shelby Cnty.*, 220 F.3d 433, 443 (6th Cir. 2000) (citing *Leila Hosp. & Health Ctr. v. Xonics Medical Sys.*, 948 F.2d 271, 278 (6th Cir. 1991) (setting forth the three-part test above)).   The Court does not believe that this standard applies when a district court is reviewing a jury's award of punitive damages; instead, it applies to compensatory damage awards.[5]  *Id.*  However, out of an abundance of caution to Defendant's rights, the Court will examine the award under the "common-law" standard as well.

---

5) The Sixth Circuit in *Gregory* applied *Xonics*' test to the jury's compensatory damage award and the constitutionality test announced in *BMW of N. Am. Inc. v. Gore*, 517 U.S. 559, 575 (1996), *infra*, to the punitive damages award. *See Gregory*, 220 F.3d at 443.

First, the Court finds that there was sufficient proof to support the punitive damages award. In some ways, this inquiry mirrors the degree of reprehensibility prong of the constitutional standard set forth in *Gore*, which is more thoroughly addressed below. The jury heard evidence about Defendant's conduct, including the lack of investigation into certain potential eyewitnesses, the delay between disclosure of abuse and arrest, and the intentional material omissions from her warrant application, from which it could infer that she was reckless or callous with regard to Wesley's constitutional rights.

Second, the punitive damages award in this case does not shock the conscience. Given his amount of compensatory damages, an award of punitive damages that is less than a 1:1 ratio is not excessive. Wesley testified about the emotional, physical, and professional injuries he suffered as a result of his unlawful arrest, and that evidence supports the jury's award. Moreover, there is no indication that there was a mistake in calculating the punitive damage award.

There is no evidence that the punitive damage award was clearly excessive, the result of the passion, bias, or prejudice of the jury, or shocking to the judicial conscience. *See Gregory*, 220 F.3d at 443 (citing *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1396 (6th Cir. 1990)). Therefore, the jury's punitive damage award is sufficient under the common-law standard of review.

### ii.    *Constitutional Standard*

Defendant also argues that the jury's punitive damage award is so excessive that it violates her constitutional Due Process rights. A court should consider the following three factors when assessing whether a punitive damage award is excessive: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the harm or potential

20

harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages and the civil penalties authorized or imposed in comparable cases. *Gore*, 517 U.S. at 575.

The first, and most important, factor is the degree of reprehensibility of Defendant's conduct. *See State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 419 (2003) (holding that the "most important indicium of reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.") (quoting *Gore*, 517 U.S. at 575). In considering the reprehensibility of Defendant's conduct, the Court should consider whether: (1) the harm was physical as opposed to economic; (2) the conduct demonstrated an indifference to the health or safety of others; (3) the target had financial vulnerability; (4) the conduct involved repeated actions or was an isolated incident; and (5) the harm was the result of intentional malice, trickery, or deceit, or was a mere accident. *Id.*

Here, the harm inflicted on Wesley by Defendant was physical was well as economic. While he certainly suffered some lost wages, much of the damage done to him was emotional. A jury could have reasonably found that Defendant's conduct "evinced an indifference to or a reckless disregard of the health and safety" of Wesley, as was demonstrated in previous sections of this opinion. *See id.* It is not clear that Wesley was financially vulnerable, but he certainly was not a wealthy man. The conduct does appear to be an isolated incident in Defendant's career, and is the only incident between these parties, but this factor alone is not determinative. Additionally, there is sufficient evidence that Defendant's intentional material omissions from her warrant application, while not malicious, may have involved some level of trickery or deceit. If all of these factors were absent, or maybe if only one was present, the Court would have reason to be suspicious

21

of the punitive damage award.  *Id.*  Here, however, there are several factors present, supporting a finding of reprehensibility.

The second factor is the ratio of compensatory to punitive damages.  The Sixth Circuit has held that in a "§ 1983 case in which in the basis for the punitive damages award is the plaintiff's unlawful arrest claim" and where the compensatory damages are minimal, the ratio factor is "of limited relevance."  *Romanski v. Detroit Entm't, LLC*, 428 F.3d 629, 645 (6th Cir. 2005).  In this case, however, the compensatory damages were significant, given the effect that the unfounded allegations had on Wesley, both personally and professionally.  In any event, the ratio between the punitive and compensatory damages is less than 1:1 – much less than the "single-digit" ratios (i.e., up to 9:1) that *State Farm* stakes as the outer bounds of constitutionally permissible.  *State Farm*, 538 U.S. at 425 ("Our jurisprudence and the principles it has now established demonstrate . . . that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.").   Accordingly, the ratio of punitive damages in this case is reasonable and permissible.

The final constitutional factor to consider is the difference between the punitive damages and the civil penalties authorized or imposed in similar cases.  *Id.* at 418 (citing *Gore*, 517 U.S. at 575).  "The purpose of this guidepost reflects an elementary principle of due process – namely, that the defendant must have been provided 'fair notice' that its conduct would subject it to a penalty on the order of the punitive damages award." *Romanski*, 428 F.3d at 648 (citing *Gore*, 517 U.S. at 583-84).  While it is true that there are no civil penalties authorized or imposed in this case, the Court should still ask whether Defendant had fair notice that a verdict against her could result in $500,000 in punitive

damages.  A police detective should be aware that violating someone's constitutional rights "might result in a punitive damages award if the conduct is sufficiently egregious."  *Id.* (citing *Smith*, 461 U.S. at 56).  It seems reasonable to assume that Defendant would have been aware that arresting a child behavioral specialist for the rape of one of his students, without probable cause and while intentionally omitting material information from her warrant application, could make her liable for damages well within the amount found by the jury.

After examining all three factors announced in *Gore*, the Court finds that Defendant's conduct was sufficiently reprehensible, the less-than-1-to-1 ratio of punitive to compensatory damages was reasonable and well within the limits of *State Farm*, and that Defendant had fair notice of a punitive damage award of the size awarded by the jury in this case.  Accordingly, the punitive damages award does not violate Defendant's due process rights.

### 6.    Compensatory Damages are supported by credible evidence.

Finally, Defendant argues that various portions of the compensatory damage award are not supported by credible evidence.  In determining whether a damage award should be remitted or whether a new trial should be granted, courts must determine if the damage award is "beyond the maximum damages that the jury could find to be compensatory for a party's loss."  *Gregory*, 220 F.3d at 443 (quoting *Jackson v. City of Cookeville*, 31 F.3d 1354, 1358 (6th Cir. 1994)).   An award must stand unless it is: (1) beyond the range supportable by proof; (2) so excessive as to shock the conscience; or (3) the result of a mistake.  *Id.* (citing *Bickel v. Korean Air Lines Co., Ltd.*, 96 F.3d 151, 156 (6th Cir. 1996)); *see also Xonics Medical*, 948 F.2d at 278 (delineating the same three-factor test).

23

The jury in this case awarded Wesley: $132,000 for lost wages; $300,000 for past pain and suffering; and $150,000 for future pain and suffering.  Defendant challenges each of these awards as being unsupported by the evidence.

### i.    *Lost Wages*

Defendant makes two arguments explaining why the lost wages award should be vacated or remitted.  First, she claims that Wesley's arrest occurred after his termination, disproving that his termination was caused by the arrest.  Second, Defendant argues that Wesley's termination was caused by a lack of funding for his position, rather than her investigation and subsequent arrest.

Despite the fact the Wesley's arrest occurred after his termination, the arrest for sexual abuse remained on his record until fall 2010.  During this time, as the testimony of Lynda Jackson – former superintendent of Covington Independent Schools – demonstrated, it is extremely unlikely that any school would have interviewed him for a job. Additionally, Jackson testified that, because of the gap in his resume caused by the arrest, Wesley would have had several hurdles to overcome in getting an interview.  The red flags caused by his false arrest, and the resulting unemployment period, were detrimental to Wesley's ability to be rehired in any position, but especially in one working with children. Further, even if Wesley was terminated from his position due to budgetary restrictions, which, given the circumstances, the jury would have been reasonable in considering suspect, Defendant's arrest still caused him sufficient harm to justify the jury's award.

### ii.    *Past Pain and Suffering*

Defendant next argues that Wesley's past pain and suffering should be remitted because it was not supported by medical evidence and because the multiple potential

24

causes of Wesley's injury require expert testimony to indicate the amount of the harm that
was caused by Defendant, something Wesley did not offer during the trial.

Before delving into these issues, the Court must determine the proper source of law.
When federal law is absent or deficient on issue presented in a § 1983 case, the court
should apply "the common law, as modified and changed by the constitution and statutes
of the State wherein the court having jurisdiction [of the matter] is held, so far as the same
is not inconsistent with the Constitution and laws of the United States" to aid in the trial and
disposition of the case.  42 U.S.C.  § 1988(a).  The Supreme Court has interpreted this
provision as allowing "both federal and state rules on damages [to] be utilized, whichever
better serves the policies expressed in federal statutes."  *Sullivan v. Little Hunting Park,
Inc.*, 396 U.S. 229, 240 (1969); *see also McDaniel v. Carroll*, 457 F.2d 968, 969 (6th Cir.
1972) (holding that the common law of a state may be used on the issue of damages in a
civil rights case when it better serves the policies expressed in the federal statutes).  Thus,
to the extent there is not a federal rule on the remaining damage issues raised by
Defendant, the Court will apply Kentucky law, so long as its laws are consistent with federal
law and policy.

Kentucky law does not require medical proof for past pain and suffering awards, and,
instead, notes that "there is no legal yardstick for measuring and no slide rule for computing
compensation for pain and suffering" caused by a tort.  *Noel v. Creary*, 385 S.W.2d 951,
953 (Ky. 1964); *see also* RONALD W. EADES, KENTUCKY HANDBOOK SERIES, KENTUCKY LAW
OF DAMAGES § 36.2 (Thomson Reuters 2015).  What is required is that damages be proved
to a reasonable degree of certainty.  *Pauline's Chicken Villa, Inc. v. KFC Corp.*, 701 S.W.2d
399, 401 (Ky. 1985).  In the context of pain and suffering, however, this task often proves

25

difficult.  There is no rigid or mathematical formula, *City of Paducah v. Brunnhoper*, 135 S.W.2d 413, 418 (Ky. Ct. App. 1939), so the measure  of loss must be based on reasonableness.   *Noel*, 385 S.W.2d at 953.  The reviewing court must ensure that the award only compensates the plaintiff, and is not based on bias, sympathy, or a desire to punish.  *Id.*  But unless the award is so great that it  strikes the court at "first blush" as unreasonable, the jury's verdict should stand.  *Brunnhoper*, 135 S.W.2d at 418.

The Court finds that the past pain and suffering award is reasonable and supported by the evidence presented at trial.  Wesley testified powerfully about the mental anguish and physical toll being wrongfully arrested caused him.  He described sleepless nights, anxiety, feelings of hopelessness and humiliation, fear, anger, and depression.  From this and other evidence, the jury reasonably calculated his past pain and suffering award.

Additionally, Defendant argues that the potentially multicausal nature of Wesley's injury requires proof by expert testimony.  The case that Defendant cites for this proposition is an unpublished Kentucky Court of Appeals case, *Hassler v. Paramount Arts Ctr. Inc.*, No. 2006-CA-001200-MR, 2007 WL 1954095, at *2-3 (Ky. Ct. App. July 6, 2007).  *Hassler* was a case about the alleged adverse medical effects a plaintiff suffered after she was exposed to chemicals emitted by pyrotechnics at a concert.  *Id.* at *1.  The plaintiff in that case alleged that she endured a chemical burn to her lungs as a result of the defendant's negligence.  *Id.* The *Hassler* court held that, when common knowledge or experience of a layman is not extensive enough to infer *negligence* from the facts, expert medical testimony is required.  *Id.* at 2-3 (emphasis added) (citing *Jarboe v. Harting*, 397 S.W.2d 775 (Ky. 1965)).

The *Hassler* opinion was focused on the proof required to show causation rather than the amount of damages.[6]   Ordinarily, a defendant's negligent conduct is the legal cause of a harm to another if: (1) it is a substantial factor in bringing about the harm; and (2) there is no rule of law relieving the actor from liability because of the manner in which his negligence resulted in the harm.   This case, in contrast to *Hassler*, is one in which expert testimony is not required to prove either causation or the amount of damages.   While Defendant may have not been alone causing Wesley's injuries, she certainly was a substantial factor in bringing them about.   Her unlawful arrest of Wesley made it incredibly difficult, if not impossible, for him to obtain employment working with children, depriving Wesley of his dream job.   Additionally, Wesley testified that the act of the arrest itself was traumatic, with the police showing up at his door and escorting him to jail.   The arrest and detention of Wesley would not have occurred if it were not for Defendant's arrest warrant. It does not require an expert to prove that being wrongfully arrested for child sexual abuse could cause a person pain and suffering.   Thus, the Court finds that the past pain and suffering award was supported by the evidence presented at trial.

---

6) There is some debate in Kentucky law about whether the reasonable certainty inquiry applies to the amount of the award or the causation element of the claim. *Compare Roadway Exp., Inc. v. Don Stohlman & Assocs., Inc.*, 150 436 S.W.2d 63, 65 (Ky. 1968) (holding that the question is not whether the amount can be ascertained with exactness, but whether the cause of the injury can be traced to the wrongful act with certainty), *with Pauline's Chicken Villa*, 701 S.W.2d at 402 (holding that the amount of lost profits that could have occurred under a breach of contract were too speculative to permit recovery) *and Ky. Dep't of Highways v. Jent*, 525 S.W.2d 121, 122-23 (Ky. Ct. App. 1975) (denying a claim where the amount of damage caused to plaintiffs' land was deemed not to be reasonably certain). Here, however, causation is not really in issue.   Instead, Defendant contests the total amount awarded for past pain and suffering, and what her share of the damage should be.   But due to the unsettled nature of the law in this area, the Court's opinion also addresses the causation issue presented in Defendant's motion.

27

### iii. *Future Pain and Suffering*

Defendant finally claims that the jury's award for future pain and suffering damages must be remitted because Wesley did not produce any medical evidence that his emotional injuries were permanent.  However, "[f]uture pain and suffering is an element of damages for which the injured party is entitled to recover – if there is evidence establishing that it is reasonably certain that pain and suffering will occur."  *May v. Holzknecht*, 320 S.W.3d 123, 128 (Ky. Ct. App. 2010) (citing *Am. States Ins. Co. v. Audubon Country Club*, 650 S.W.2d 252, 254 (Ky. 1983)).   Moreover, there is no rule to indicate that, where no future medical expenses are indicated, the jury is prohibited from finding an award of future pain and suffering. *Id.*  Rather, the test is whether there is evidence to suggest that the plaintiff's pain and suffering are likely to continue to occur.  *Id.*

Here, Wesley provided sufficient evidence to establish that his pain and suffering are reasonably certain to continue in the future.  Even though Wesley has now found new employment, he still cannot bring himself to work with children.  Moreover, he testified that he becomes fearful when alone with children, even in public, for fear of being falsely accused again.  He still has nightmares about his ordeal.  While he has moved away from the area and tried to start his life anew, there was sufficient evidence to support a finding that his pain and suffering are likely to continue into the future.  On this record, the jury's award for future pain and suffering is reasonable.  Therefore, Defendant's Motion to Alter, Amend, or Vacate for a New Trial is **denied** in full.

28

IV.     **Conclusion**

Accordingly, for the reasons stated herein,

**IT IS ORDERED** that Defendant's Renewed Motion for Directed Verdict (Doc. # 163)

is **denied**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Alter, Amend, or Vacate the

Judgment for a New Trial (Doc. # 164) is also **denied**.

This 3rd day of March, 2016.



Signed By:
*David L. Bunning*
United States District Judge

G:\DATA\ORDERS\Cov10\10-51 MOO Denying JNOV and MNT.wpd

29